[No. 7449. Decided April 1, 1909.]

ELLEN TRUDELLE BALAM, *Appellant*, v. FRANK ROULEAU
*et al.*, *Respondents*.[1]

CANCELLATION OF INSTRUMENTS—DEEDS—UNDUE INFLUENCE—EVI-
DENCE—SUFFICIENCY. There is no evidence that undue influence, in-
duced a conveyance of real and personal property, reserving a life
estate in the land, in consideration of an agreement for support and
pin money during the life of the grantors, where it appears that one
of the grantors was sick and 70 or 80 years old, and executed the
agreement after long consultation with three of his lifelong friends,
prominent business men, who had no interest in the matter, and
the same was carefully explained to his wife, a half-breed Indian,
who was not coerced in any way and fully understood the matter,
if capable of doing so.

SAME—CONSIDERATION—ADEQUACY. A conveyance by an old couple
of a farm of the value of about $2,000 or $3,000, and $700 worth of
farm implements and personal property, to the husband of a niece,
who was their sole beneficiary in a will, is not void for inadequacy
of consideration, where a life estate in the land was reserved, and
the grantee agreed to work the place and share the profits in the
chickens, board and lodge the grantors and the survivor for life,
and pay a certain small monthly sum; especially where three prom-
inent business men, friends of the grantors, advised the arrangement.

[1]Reported in 100 Pac. 833.

Appeal from a judgment of the superior court for San Juan county, Joiner, J., entered December 6, 1907, upon findings in favor of the defendants, in an action to cancel a deed. Affirmed.

*H. E. Peck*, for appellant.

*A. J. Craven* and *W. R. Garrett*, for respondents.

FULLERTON, J.—In this action the appellant sought to cancel and set aside a deed and bill of sale, executed by herself and her former husband, one Isaiah Pappillion, conveying to the respondent, Frank Rouleau, certain real and personal property. The real property in question is farming land, and was acquired by the appellant and her husband under the land laws of the United States. The personal property consisted of farming implements and machinery and live stock. The instruments in question were executed on May 3, 1904. At that time the appellant and her then husband were residing on the land, and had so resided thereon for many years. The appellant is a half-breed Indian, and at the time of the execution of the deed and bill of sale was upward of 60 years of age. Her husband was of French extraction, and was at that time between 70 and 80 years old. The husband had been ill for some time, and evidently feared that he was near dissolution. The deed and bill of sale were evidently executed with the idea of preserving the property for the use of the appellant for the time she should survive her husband. The deed reserved a life estate in the land conveyed to the grantors and to the survivor of them.

The bill of sale contained certain promises and agreements which expressed the real consideration for the conveyances, and may be summarized as follows: (1) The grantee undertook to pay to the grantors for the remainder of their natural lives and for the life of the survivor of them fifteen dollars per month; (2) to pay all taxes and other legal assessments then due or to become due upon the property conveyed to him; (3) that the poultry then on the premises and thereafter

to be kept thereon should belong share and share alike to each of the parties, and the profits arising therefrom should be divided equally between them; that such poultry should have the freedom of the premises and be fed and cared for from the products of the premises as is usual and customary; (4) that certain rooms in the house should be reserved for the sole use and occupation of the vendors or the survivor of them; and so long as they together or either of them singly resided therein, the vendor should furnish them with wholesome and adequate board, the same as he provides for his own family, at the rate of twelve dollars per month while both should live and six dollars per month during the life of the survivor; (5) that should the wife survive the husband and should not be content to live in the house with the vendee, then he should build for her a good substantial two-room dwelling house, not less than 12x24 feet in size, at any point along the east side of a designated tract that she should select, which house, together with an acre of land surrounding the same, she should have for her own private residence free from rent, taxes, charges or interferences of any kind; (6) that after she should become domiciled in such house, the vendee should pay her thereafter ten dollars per month in lieu of all other obligations mentioned in the agreement.

Isaiah Pappillion died on May 5, 1904, the second day after the agreement had been executed. The appellant continued to reside with the respondent on the farm until October 9, 1904, when she married one John Balam, and took up her residence with him at another place. Rouleau made the payments to her provided in the contract until August 1907, when the present action was begun to set aside the conveyances, as above stated. No contention is made, either in the pleadings or the evidence, that Rouleau has not performed the covenants of the agreement; but it is alleged, and it was sought to be proven at the trial, that both Pappillion and the appellant were induced to execute the instruments of conveyances by undue influence exercised by Rouleau and certain

other persons who desired Rouleau to have the property; it being contended also that the consideration for the conveyances was grossly inadequate. The court, after hearing the evidence, found that no undue influence had been practiced on the parties and that the consideration was fair and just, and entered a judgment to the effect that the plaintiff take nothing by her action.

On the question of undue influence, it seems to us that the evidence utterly fails to show that either the appellant or her husband were in any manner overreached. The scheme originated with Pappillion himself. Before executing the instruments he called to his bedside three of his lifelong friends, one of whom was his family physician, another a county commissioner of the county in which he lived, and a third a prominent business man, all of them men of character and capacity, and all of them without other interest in the matter than that of friendship for the aged couple. To these Pappillion stated his desires and the scheme finally adopted was only arrived at after a long consultation during which the appellant was present, and at which great pains were taken to make her know and understand what was going on and what was desired. While Pappillion was at that time both aged and ill, all of the witnesses agree that his mind was clear, and that a variety of schemes were discussed with him before this one was adopted. The evidence leaves but little doubt that he fully understood and fully consented to the entire proceeding. As to the appellant, while the evidence is not so clear, we do not think she was in any manner misled. She was unlettered, and somewhat unfamiliar with the English language, and accustomed to rely in matters of business largely on her husband's judgment; yet, as we say, great pains were taken, both when the agreement was being talked over and when the papers were executed, to make her know and understand them. There is no evidence of any attempt to overreach her. If she did not understand the purport of the proceedings it was because she was incapable of doing

so, as the attempt was to make the facts known to her, not to conceal them from her. We believe she fully understood them.

As to the consideration, the evidence is not as full as we would like to have found it. The tract of land conveyed contained some 140 acres. It was all farm land, only 45 acres of which was at that time cleared and capable of being cropped. A witness, the only one who seems to have testified on the matter, valued the land at from $2,000 to $3,000. No witness testified as to the value of the personal property, but it was stated in the defendant's answer to have been worth $700. Taking these as fair estimates of the value of the property conveyed, it would seem that the price paid was not so grossly inadequate as to require the vacation of the sale as a matter of equity. It must be remembered, also, that the wife of the grantee was a daughter of Pappillion's sister, that he had no children himself, and that Rouleau and his family had been selected by him as the objects of his bounty; in fact, he left a will in which he named Frank Rouleau as his sole beneficiary. Moreover, we feel that the men with whom Pappillion counseled would not have consented to a disposition of the property for a grossly inadequate consideration unless they had been directly commanded to do so by Pappillion himself, and the record is clear that he did not so command.

On the whole record, therefore, we think the judgment should stand affirmed, and it will be so ordered.

RUDKIN, C. J., MOUNT, CROW, and DUNBAR, JJ., concur.

CHADWICK, GOSE, MORRIS, and PARKER, JJ., took no part.