[No. 30483. Department Two. May 20, 1948.]

MARGARET THILMAN *et al., Respondents and Cross-appellants,* v. MYRTLE L. THILMAN, *Appellant.*[1]

*V. O. Nichoson,* for appellant.

*Tonkoff & Holst* and *Grady & Grady,* for respondents and cross-appellants.

BEALS, J.—Louis Thilman and his first wife settled in Yakima county some time prior to 1900. They had two children, Lillian Thilman and Florence Thilman, who, at the time of their father's death in 1912, were aged, respec-

[1]Reported in 193 P. (2d) 674.

tively, thirty-one and twenty-four years. Mrs. Thilman died, and Mr. Thilman then married Margaret Thilman, one of the plaintiffs in this action. Louis and Margaret had three children: Louis Francis Thilman (referred to herein as Francis) and Paul Arnold Thilman (who, at the time of their father's death were aged, respectively, fifteen and nine years), and a third son, Leonard Thilman, who died, in infancy, prior to his father's decease.

During the year 1901, Louis and Margaret Thilman had acquired eighty acres of land, lying east of the city of Yakima, in the Terrace Heights district. Fifty-two acres of the land were irrigated; twenty-eight acres, having no water right, remained dry and uncultivated, and were referred to as the "dry lands."

Louis Thilman died, testate, in Yakima county, February 29, 1912. His will was admitted to probate, and his widow, Margaret Thilman, was appointed executrix thereof.

The estate consisted of the land, cash, some stock, household furniture, and farm machinery. The property was the community property of Louis and Margaret Thilman, and her community half was distributed to her, while, under the will of Louis Thilman, there was distributed to the widow six hundred dollars in trust for Lillian Thilman, six hundred dollars in trust for Florence Thilman, to Margaret personally all cash, and to her all personal property belonging to the estate, with full power of use and sale during her lifetime. Any of Louis Thilman's half of the personal property remaining after her death was to be distributed, one fourth to each of the children of Louis Thilman. There was, then, distributed to Margaret Thilman her community half interest in the real estate and, under the will of Louis Thilman, a life estate in the other undivided one half thereof, together with the issues and profits accruing therefrom.

In addition to this life estate, Margaret Thilman was, by the decree of distribution pursuant to the will of her late husband, vested with the power to sell the twenty-eight acres of dry land referred to above.

Louis Thilman also devised to his four children, one fourth to each, his interest in the land, subject to the life

estate (with power to sell the dry land) in favor of his wife, Margaret Thilman, and this interest, or remainder, in the land was distributed to the children.

Under the decree of distribution, title to the eighty acres of land was vested as follows: One half in Margaret Thilman, she also possessing a life estate in the other half, that half, at her death, to go to the four children of Louis Thilman, each of whom, consequently, owned an undivided one-eighth interest in the eighty acres, subject to Margaret Thilman's life estate in their father's one half thereof.

All of the children continued to live on the ranch with Margaret, their stepmother and mother. The two girls never married and have lived secluded lives. At the time of his father's death, Francis ceased attending school and assisted his mother in conducting the farm.

In 1931, Francis Thilman married Myrtle, now his widow, and the defendant in this action. Francis died, childless, July 15, 1945, leaving a will, which was admitted to probate, pursuant to which his entire estate was distributed to Myrtle Thilman by a decree bearing date February 27, 1946.

Paul Thilman married Katherine, November 8, 1929, and, at his death, which occurred July 13, 1940, left surviving him his widow, Katherine (now Katherine Engberg, one of the plaintiffs herein), and a minor daughter, Margaret Mary. In the matter of the estate of Paul Thilman, deceased, the entire estate was awarded to his widow, Katherine Thilman, in lieu of homestead.

Francis Thilman, at all times after his father's death, lived upon the ranch and assisted his mother in operating the same. After his marriage, Francis and his wife continued to live on the ranch, raising their own chickens and turkeys for sale, Francis taking a more and more active part in caring for the property.

November 4, 1929, Margaret Thilman delivered to her son Francis eight thousand dollars, it appearing that he had never received more than a mere living for the years he had devoted to working on and caring for the farm property.

Paul Thilman, during most of the time after his marriage, resided upon a ten-acre fruit orchard, which his mother had

purchased in 1918, farming the land and receiving the income therefrom. September 16, 1937, Margaret Thilman deeded this ten-acre tract to Paul, and he continued to live on the property until his death, July 13, 1940.

As above stated, Paul's entire estate, including the ten-acre farm and his remainderman's interest in the eighty-acre tract, was distributed to his widow, Katherine.

After Paul's death, the family situation was as follows: The original farmhouse was occupied by Margaret Thilman and her two stepdaughters. It appears from the evidence that these two women were, to say the least, peculiar. They never associated with outsiders and would run, one witness said, "like wild hares" from strangers. Apparently, they seldom, if ever, left the ranch; they dressed roughly and worked hard on the farm.

At the time of filing the original complaint in this action, the court signed an order appointing Katherine Engberg as guardian *ad litem* for Lillian and Florence Thilman, who are described in the order as "incompetents," and for Margaret Mary, the minor child of Paul and Katherine.

It appears that Paul had always been Margaret Thilman's favorite son. While he did not live with her on the ranch, he visited her almost every day. Mrs. Thilman had purchased two automobiles, one being used by Paul and the other by Francis. It is evident that Mrs. Thilman passed most of her time upon the farm; that she was a rather opinionated woman, and, doubtless, not particularly easy to get along with.

Paul's widow and daughter continued to live upon the ten-acre tract referred to above.

Francis and Myrtle were living on the farm in a made-over potato warehouse, distant about one hundred feet from his mother's home. He was a hard-working farmer of limited education. Outside of the eight thousand dollars received from his mother in 1929 for past labor upon the farm, he received comparatively little for his labor. He and his wife raised and sold chickens and turkeys and, apparently, lived very modestly.

It appears that, September 16, 1937, when Margaret deeded the ten-acre ranch to Paul, she had been taken suddenly ill and was about to be hospitalized. She recovered, but it would seem that she executed the deed in contemplation of what might have proved to be a serious illness.

Soon after Paul's death, Margaret Thilman, together with her son Francis, and the latter's wife, called at the office of Rigg, Brown & Halverson, lawyers, at Yakima. They talked with Mr. Halverson, Mrs. Thilman explaining her situation to him, saying that her other son, Paul, had died a few days before. She told of having given Paul the ten-acre tract and stated that Francis had worked on the ranch for years, and that she wanted to turn all of her property over to him, reserving a life estate for herself.

As a result of this interview, several instruments were prepared: (1) an agreement between Margaret Thilman and Francis; (2) a quitclaim deed from Mrs. Thilman to Francis; (3) a bill of sale covering personal property; (4) a will, whereby Mrs. Thilman devised all of her estate (save one hundred dollars to her granddaughter, Margaret Mary) to her son Francis, and (5) a document, one part of which was signed by Margaret, and the other by Francis, referring to the eight thousand dollars which Francis received in 1929.

These documents, and others bearing later dates, will be more fully discussed hereafter.

December 16, 1946, the plaintiffs in this action, Margaret Thilman and Katherine Engberg, individually and as guardian *ad litem* for Lillian Thilman, Florence Thilman, and for her daughter, Margaret Mary Thilman, filed their complaint, naming Myrtle L. Thilman and all persons unknown claiming by, through, or under Myrtle L. Thilman, as defendants.

January 24, 1947, plaintiffs having retained other counsel, an amended complaint was filed, naming the same parties, with the exception that Katherine Enberg was not named in the caption as guardian *ad litem* for her daughter, Margaret Mary, Mrs. Engberg having previously been appointed guardian *ad litem* for Lillian and Florence Thilman, de-

scribed in the order as "incompetents," and for Margaret Mary, her daughter, a minor.

In their amended complaint, plaintiffs alleged the distribution of the estate of Paul Thilman to his widow, Katherine; that plaintiff Margaret Thilman and Louis Thilman had been husband and wife; that the two plaintiffs Lillian and Florence Thilman were the daughters of Louis Thilman by a prior marriage; that Louis and Margaret Thilman had two sons, Francis and Paul, who were both deceased; that the defendant, Myrtle L. Thilman, was the widow and sole heir of Francis; that, after the death of Louis Thilman, February 29, 1912, his will was admitted to probate and his estate distributed as hereinabove described.

It was further alleged that, July 30, 1940, the plaintiff Margaret Thilman "purported to execute a certain written agreement," thereafter filed for record in the office of the auditor for Yakima county, and

". . . that in accordance with the terms contained in said agreement, the said Margaret Thilman did, on the 30th day of July, 1940, reserving unto herself a life estate, purport to execute a quitclaim deed to the entire 80-acre tract hereinbefore described in paragraph 5 of this complaint, wherein said Louis Francis Thilman, also known as Francis L. Thilman, was named as grantee."

The complaint continued by alleging that, on the same date, Margaret Thilman purported to execute a bill of sale to Francis Thilman covering all of the personal property on the premises described in the written agreement previously referred to; that, on the same day, Margaret Thilman purported to publish her last will and testament, in accordance with the terms and conditions contained in the agreement referred to, and that the purported will was not in the possession of Margaret Thilman, nor did she have a copy thereof or know the provisions thereof, the complaint further alleging that the will referred to was not the last will and testament of Margaret Thilman.

The complaint continued by alleging that, October 21, 1940, Margaret Thilman purported to execute a written agreement, which was duly recorded, in substance a con-

tract for the conveyance of certain "dry lands" described therein; that Margaret Thilman did subsequently purport to execute a deed to the dry lands, conveying the same to Francis Thilman (thereby releasing her life estate in that land).

It is further alleged in the complaint that all of the documents above referred to were not freely and voluntarily executed by Margaret Thilman, but were executed by her when she was acting under duress, fear, and undue influence, and under coercion by Francis Thilman, the grantee therein named, and, further, that, at the time of the execution of the documents named, Margaret Thilman lacked sufficient mental capacity, by reason of age, and physical and mental condition, to know, understand, or comprehend the nature or meaning of the instruments, and that she did not intend to execute the same; that they were executed without consideration, and were an unauthorized exercise of the power of sale vested in Margaret Thilman under the terms of the will of her late husband, Louis Thilman; that each of the agreements referred to in the complaint was the result of fraud perpetrated upon Margaret Thilman by Francis Thilman and by the defendant, Myrtle Thilman.

Plaintiffs prayed for a decree vacating and setting aside all of the instruments described in the amended complaint, and for a decree quieting title to the property, an undivided one-eighth interest thereof in plaintiff Lillian Thilman, and the same interest in each of the plaintiffs Florence Thilman and Katherine Engberg, subject to a life estate in favor of plaintiff Margaret Thilman, and that the defendant be enjoined from making any claim to any interest whatsoever in the property except to the one-eighth interest therein which defendant inherited from her husband, Francis Thilman. Plaintiffs also prayed for general relief.

The defendant, by her answer, admitted that plaintiff Margaret Thilman executed the instruments referred to in plaintiffs' complaint, but denied that the instruments were executed pursuant to coercion, fraud, or undue influence; affirmatively alleging that the instruments referred to were the free and voluntary act and deed of plaintiff Margaret

Thilman, executed and delivered with full knowledge on her part as to the contents and subject matter thereof; that her late husband, Francis Thilman, and the defendant had performed all the terms, covenants, and conditions required of them in the contracts referred to; that she, the defendant, was the sole heir of her late husband, Francis Thilman, and that she, the defendant, was the owner of an undivided five-eighths interest (subject to the life estate of plaintiff Margaret Thilman) in certain real estate, and the absolute owner of another tract of real estate (the dry lands).

Defendant asked that her title to the property be quieted as against the plaintiffs and each of them.

Plaintiffs filed their reply denying the material affirmative allegations contained in the answer.

The eighty-acre tract, which was the community property of Louis and Margaret Thilman (referred to by the parties as the "home place"), is described as follows:

"The Southeast Quarter of the Northwest Quarter and the Northeast Quarter of the Southwest Quarter of Section twenty-two (22), Township thirteen (13) North of Range nineteen (19) E.W.M., containing 80 acres more or less, and

"A strip of land one rod wide beginning at the Southwest corner of the Southwest Quarter of Northwest quarter of Section 22, Township 13, North of Range 19, E.W.M., running thence North one rod; thence East, parallel with the South line of said quarter, eighty rods, thence South one rod and thence West eighty rods to the place of beginning for a road."

The nonirrigated, twenty-eight-acre tract, referred to as the "dry lands," is described as:

"That part of the Southeast Quarter of the Northwest Quarter, and that part of the Northeast Quarter of the Southwest Quarter of Section 22, Township 13 North, Range 19, E.W.M., lying easterly and above the Selah-Moxee Canal, containing 28 acres, more or less."

The instruments executed and delivered by plaintiff Margaret Thilman, which are the subject of plaintiffs' attack in this action and all of which were introduced as exhibits during the trial, are the following:

(1) A quitclaim deed, signed and acknowledged July 30, 1940, by the plaintiff Margaret Thilman, conveying to Francis L. Thilman the eighty-acre tract and the adjoining strip one rod wide for road purposes (known as the home place), reserving to the grantor a life estate therein. The conveyance recites that it was made for the sum of one dollar and other good and valuable considerations, and the instrument was filed for record in the office of the auditor for Yakima county, October 16, 1944.

(2) A bill of sale, signed and acknowledged by Margaret Thilman, as grantor, July 30, 1940, conveying to Francis L. Thilman all livestock, farm tools, implements, equipment, and so forth, owned by the grantor and located or used in connection with her farming operations on the land referred to in No. 1, *supra*. The conveyance recites that it was made for the sum of one dollar and other good and valuable considerations. Attached to the foregoing bill of sale is a writing, dated July 30, 1940, signed by Margaret Thilman and Francis L. Thilman, whereby he agreed to pay to Margaret Thilman the sum of eight hundred dollars, on or before one year from date, in full consideration for the property described in the bill of sale. There is also attached thereto a check for eight hundred dollars, drawn by Francis L. Thilman, dated May 16, 1941, payable to Margaret Thilman, which check was endorsed by the payee and cashed. The bill of sale was filed for record in the office of the auditor for Yakima county, October 16, 1944.

(3) A written agreement, dated July 30, 1940, between Margaret Thilman, first party, and Francis L. Thilman, second party, reading as follows:

"THIS AGREEMENT, Made this 30th day of July, 1940, by and between MARGARET THILMAN, widow of Louis Thilman, hereinafter called Party of the First Part, and FRANCIS L. THILMAN, hereinafter called Party of the Second Part,

"WITNESSETH:

"WHEREAS, Margaret Thilman prior to the 16th day of September, 1937, was the owner of the following described real estate situate in the County of Yakima, State of Washington, to-wit:

"Beginning at a point on the South line of Section 16, Township 13 North, Range 19 E.W.M., where said South line crosses the lower line of the right of way of the Selah-Moxee Canal Company's Canal as now constructed; thence West on said section line 891 feet; thence North 775 feet more or less to the lower line of the right of way of the Selah-Moxee Canal Company's Canal as now constructed; thence following said line of said right of way in a southeasterly direction to the point of beginning, containing 10 acres more or less.

"hereinafter referred to as the ten acre tract, and

"WHEREAS, said Margaret Thilman did on the 16th day of September, 1937, deed all of said property to her son Paul Thilman, and

"WHEREAS, Margaret Thilman is now the owner of an undivided one-half interest in the following described real estate situate in the County of Yakima, State of Washington, to-wit:

"The Southeast Quarter of the Northwest Quarter and the Northeast Quarter of the Southwest Quarter of Section twenty-two (22), Township thirteen (13) North of Range nineteen (19) E.W.M., containing 80 acres more or less, and

"A strip of land one rod wide beginning at the Southwest corner of the Southwest (SW) ¼ of Northwest ¼ of Section 22, Township 13, North of Range 19 E.W.M., running thence North one rod; thence East, parallel with the South line of said quarter, eighty rods; thence South one rod and thence West eighty rods to the place of beginning for a road.

"said property being hereinafter referred to as the home place, together with the tenements, hereditaments and appurtenances thereunto appertaining and belonging, and all water rights thereto appertaining and belonging of every kind and description whether appurtenant to the land or otherwise, including a water right in the Selah-Moxee Canal Company, and

"WHEREAS, Francis L. Thilman, son of Margaret Thilman, Party of the First Part herein, has farmed and operated the home place since he became of age, for his mother, Margaret Thilman, she during said time having received the income from the home place, and

"WHEREAS, Paul Thilman, son of Margaret Thilman, Party of the First Part herein, has operated and received the income from the ten acre tract from the year 1931 until his death, and

"WHEREAS, said Margaret Thilman, Party of the First Part herein, has from time to time prior to the death of Paul Thilman, made improvements on said ten acre tract, and

"WHEREAS, said Party of the First Part herein did on the 16th day of September, 1937, deed said ten acre tract together with the improvements thereon to her son Paul Thilman, and

"WHEREAS, it is the desire of the Party of the First Part herein to divide her property between her two sons, namely, Paul Thilman, now deceased, and Francis L. Thilman, Party of the Second Part herein, equally or substantially so, and

"WHEREAS, it is the desire of said Party of the First Part that her son Francis L. Thilman continue to farm and operate the home place for her so long as he is physically able during the remainder of the life of Margaret Thilman, Now, THEREFORE, in consideration of the sum of $1.00 paid by each of the parties to the other, receipt whereof is hereby acknowledged, and in consideration of the mutual premises herein contained, it is hereby agreed as follows:

"(1) The Party of the First Part herein has this day executed and delivered to her son Francis L. Thilman, Party of the Second Part herein, a quitclaim deed to the home place, conveying all of her title and interest therein to Francis L. Thilman, which deed is hereby referred to and by reference made a part hereof, the Party of the First Part herein reserving in said deed a life estate in said property, and said Party of the First Part has likewise this day made, executed and delivered to her son Francis L. Thilman an absolute bill of sale conveying all of her title in and to all livestock, poultry, farm tools and equipment of every kind owned by her to her son Francis L. Thilman.

"(2) The Party of the Second Part herein, Francis L. Thilman, hereby agrees that so long as he is physically able he will during the remainder of the life of his mother, Margaret Thilman, and during the period of her life estate, farm and operate the home place for the Party of the First Part herein for an annual salary of $600.00 per year, together with the right of said Francis L. Thilman to make his home on said property, and sufficient use of the property for the maintenance of his home, during said time, and said Francis L. Thilman, Party of the Second Part herein, agrees that he will during said period of time devote his work and best efforts to the farming of said home place for the Party of the First Part. It is expressly understood and agreed that should said Francis L. Thilman die or become physi-

cally unable to farm said property before the death of his mother that this agreement nevertheless in all respects shall remain in full force and effect and be enforceable by the parties hereto, their heirs, administrators, executors or assigns, except said salary payment shall stop during the period of incapacity, if any, of the Party of the Second Part.

"(3) Said Party of the First Part, Margaret Thilman, further agrees, and it is made a consideration of this agreement that she will and has as of this date made a Last Will and Testament giving, devising and bequeathing all cash and all other property of every kind, character and description which she may own at the time of her death, unto her son Francis L. Thilman, Party of the Second Part herein, except the sum of $100.00 (One Hundred Dollars), which amount said Party of the First Part herein is bequeathing to her granddaughter Margaret Mary Thilman, now aged five years. Said Party of the First Part has by said will named her son Francis L. Thilman executor thereof to act without bond. Said Party of the First Part agrees that it is a consideration of this agreement that her said Last Will and Testament which she has this day made, which is hereby referred to and by reference made a part hereof, a copy of which is to be retained by the Party of the Second Part herein, is a final Will and irrevocable, and said Party of the First Part further agrees with said Party of the Second Part that should any attempt be made by her to destroy, revoke, or in any way change or modify said Will or the contents thereof, that such attempt to destroy, revoke, change or modify said will shall be void, and the Party of the Second Part shall be entitled if necessary to sue on this said agreement after the death of said Party of the First Part, and recover all the remaining estate of said Party of the First Part except the $100.00 bequest to Margaret Mary Thilman granddaughter of said Party of the First Part.

"(4) In consideration of this said agreement this day made and the strict performance thereof by the parties hereto, the Party of the Second Part hereby agrees to and does by these presents fully and completely relinquish and release all claims which he has or claims to have against the Party of the First Part herein, and the estate of Paul Thilman, by reason of the deeding of the ten acre tract by the Party of the First Part on September 16, 1937, to her son Paul Thilman, now deceased.

"In Witness Whereof, the parties have hereunto set their hands and seals the day and year first above written.

"[Signed]  Margaret Thilman
Party of the First Part
"[Signed]  Francis L. Thilman
Party of the Second Part

"Witnesses:
"[Signed]  Dorothy Eschbach
"[Signed]  Paul M. Goode
"[followed by the acknowledgments of the parties before C. W. Halverson, a notary public residing in Yakima]."

The foregoing instrument was filed for record in the office of the auditor for Yakima county, December 20, 1946.

(4)  A writing, entitled "Receipt," which reads as follows:

"The undersigned, Francis L. Thilman, hereby acknowledges receipt of the sum of $8,000.00 paid to him by his mother, Margaret Thilman, a widow, on the 4th day of November, 1929, said sum being payment in full of all the balance of all wages owing by Margaret Thilman to Francis Thilman for the period commencing December 13, 1918, and ending November 4th, 1929.

"Dated this 30th day of July, 1940.
"[Signed] Francis L. Thilman

"The undersigned, Margaret Thilman, acknowledges that the above money in the sum of $8,000.00 paid by her to her son, Francis L. Thilman, on said 4th day of November, 1929, was for wages earned by him during the period above set forth.

"Dated this 30th day of July, 1940.
"[Signed]  Margaret Thilman"

(5)  The last will and testament of Margaret Thilman, signed and published by her in the presence of three witnesses, July 30, 1940, whereby, after certain preliminary provisions, the testatrix bequeathed to Margaret Mary Thilman, her granddaughter, one hundred dollars; devising and bequeathing to her son, Francis L. Thilman, all the residue and remainder of her estate, and naming her son executor of her will, without bond.. To this will is attached a codicil, signed and published by Margaret Thilman, September 11, 1946, whereby the testatrix named and appointed the Seattle-First National Bank, Yakima Valley Branch, as execu-

tor of her will, in lieu of her deceased son, Francis L. Thilman. The second paragraph in the codicil reads as follows:

"Second, in all other respects I hereby confirm my said will."

(6) A warranty deed from Margaret Thilman, as grantor, to Francis L. Thilman and Myrtle L. Thilman, husband and wife, as grantees, signed and acknowledged by the grantor, October 21, 1940, conveying to the grantees, for a valuable consideration, real estate in Yakima county described as follows:

"     .     .     . an undivided one-half interest in the following described real estate, situate in the County of Yakima, State of Washington, to-wit:

"That part of the Southeast Quarter of the Northwest Quarter, and that part of the Northeast quarter of the Southwest Quarter of Section 22, Township 13 North Range 19, E.W.M., lying easterly and above the Selah-Moxee Canal, containing 28 acres more or less.

"The undivided one-half interest in the real estate above described hereby conveyed by the grantor to the grantees herein is the undivided one-half interest or community interest in said real estate above described formerly owned by Louis Thilman, deceased, and husband of the grantor."

This instrument was filed for record in the office of the auditor for Yakima county, October 16, 1944.

(7) An agreement between Margaret Thilman, as vendor, and Francis L. Thilman and Myrtle Thilman, husband and wife, as vendees, signed and acknowledged by the parties, October 21, 1940, stating the testamentary disposition by Louis Thilman of his community interest in the eighty-acre home place; that, by Mr. Thilman's will, Margaret Thilman was given the power to sell that portion of the home place known as the dry lands; that Margaret Thilman had theretofore conveyed her community interest in the farm to Francis L. Thilman; that the dry lands, being included within the Roza irrigation district, had been appraised by that district in the sum of $199.05, which was the fair cash value of the property if it remained within the district; that a petition had been filed with the irrigation district asking for the exclusion of the dry lands from the

district; that Margaret Thilman had determined to exercise her right to sell the interest of the estate of Louis Thilman in the dry lands, and that the vendees named in the agreement were willing to purchase the same; that the cash value of the twenty-eight-acre tract of dry lands was fourteen hundred dollars, provided that the land be excluded from the irrigation district, and that the cash value of a one-half interest therein was seven hundred dollars.

The parties then agreed, for a consideration of one dollar paid by each to the other, that the vendor had sold to the vendees the undivided one-half interest in the dry lands formerly owned by Louis Thilman, deceased, for the sum of $99.53; that the vendor had, by deed, conveyed to the vendees the one-half interest referred to, and that the vendees agreed that, if the dry lands should thereafter be excluded from the irrigation district, they would pay to the vendor, on demand, the additional sum of $600.47.

Checks which were introduced in evidence, together with a receipt signed by Margaret Thilman, show the payment by Francis L. Thilman to Margaret Thilman of the two sums referred to in the agreement.

This instrument was filed for record in the office of the auditor for Yakima county, December 20, 1946.

(8) An agreement and lease between Margaret Thilman, lessor, and Francis L. Thilman, lessee, signed by both parties, May 14, 1945, and acknowledged the same day by Margaret Thilman. The agreement recites that Margaret Thilman, lessor, has a life estate in the farm property, pursuant to the agreement (No. 3, *supra*) between the parties, dated July 30, 1940, whereby Francis L. Thilman agreed to work for Margaret Thilman for an annual salary of six hundred dollars a year and other considerations; that the lessor desired to be relieved from the responsibility of farming the real estate and desired to rent it to lessee for a cash rental.

The lessor then leased the land to the lessee for a term commencing January 1, 1945, and ending October 31, 1945, for the sum of five hundred dollars cash, the lessee agreeing to farm the premises properly, the crops grown to be his

property, and the rent to be payable October 31, 1945, provided lessor be living on that date; the lessee to have the option of renting the property for the year commencing October 31, 1945, for the same rental, plus payment of taxes and water charges.

The parties further agreed that the prior agreement between them (No. 3, *supra*) should be modified by relieving Margaret Thilman of the obligation to pay Francis L. Thilman six hundred dollars a year; it being agreed that all the other terms, covenants, and conditions of the prior agreement should remain in full force and effect.

The foregoing instrument was filed for record in the office of the auditor for Yakima county, January 6, 1947.

(9) An agreement between Margaret Thilman, first party, and Myrtle Thilman, second party, dated November 1, 1945, and acknowledged the same day by Margaret Thilman, wherein is stated the existence of first party's life estate in the farm property; that second party "has a remainderman's interest in said property, to-wit, an undivided ⅝ interest therein, subject to the life estate of the party of the first part"; that both parties were residing upon the property; that first party should have the use of three milch cows owned by second party; that second party might occupy the house formerly occupied by her late husband, Francis L. Thilman, and herself. Other details concerning the administration of the farm were also mentioned.

(10) A quitclaim deed from Margaret Thilman, grantor, to Myrtle L. Thilman, grantee, dated, and acknowledged by the grantor, July 2, 1946, whereby Margaret Thilman, for a valuable consideration, quitclaimed to the grantee (expressly releasing her life interest therein) the twenty-eight-acre tract known as the dry lands. This instrument was filed for record, July 8, 1946, in the office of the auditor for Yakima county.

Plaintiff Margaret Thilman was, apparently, content to recognize and acquiesce in the effect of the deeds, contract, and other instruments above described until on or shortly before the institution of this action.

The trial opened May 19, 1947. Many witnesses were sworn, the testimony comprising over one thousand pages of the statement of facts.

It appears that, during the course of the trial, William B. Holst, Esquire, one of the attorneys for the plaintiffs, was appointed guardian *ad litem* for the plaintiff Margaret Thilman.

After a lengthy oral decision, the trial court filed a written memorandum opinion, and, September 13, 1947, entered the decree, which refers to the court's oral decision.

The trial court adjudged the contract entered into July 30, 1940, between the plaintiff Margaret Thilman and her son, Francis Thilman, to be a contract for the support and maintenance of Margaret Thilman during her natural life; that, by reason of the death of Francis Thilman, July 15, 1945, Francis Thilman failed to fully perform the contract in accordance with its terms, thereby causing a partial failure of consideration, and that the contract involved the personal services and skill of Francis Thilman and could not be performed by defendant, Myrtle L. Thilman, or any other person.

The court further adjudged that, although there had been a partial failure of the consideration for the contract, by reason of the partial performance thereof by Francis Thilman, the same should not be rescinded but should inure to the benefit of the defendant, Myrtle L. Thilman.

The court further adjudged that the defendant should pay to the plaintiff Margaret Thilman the sum of $5,350, with interest, within six months from the date of the entry of the decree, and, in order to secure the plaintiff Margaret Thilman, the court awarded her a lien upon the one-half interest in and to the fifty-two-acre farm property, the lien to be foreclosed, if not paid, in the same manner as a mortgage upon real estate is foreclosed.

The court further adjudged that the defendant, Myrtle L. Thilman, is the owner of the twenty-eight-acre tract known as the dry lands, and quieted her title to that tract. The court also quieted the defendant's title to an undivided five-eighths interest in and to the fifty-two-acre farm, subject

to the life estate owned by the plaintiff Margaret Thilman, and subject to the lien established by the decree.

Plaintiff Margaret Thilman was awarded her costs; and the action as to Katherine Engberg, individually and as guardian *ad litem* for Lillian and Florence Thilman, incompetents, was dismissed with prejudice.

From this decree, the defendant, Myrtle L. Thilman, appealed, and, in due time, the plaintiffs cross-appealed from the decree.

Appellant makes the following assignments of error:

"The trial court erred in the following respects:

"(1)   In refusing to sustain the position of the defendant that the final decree of distribution in the Matter of the Estate of Francis L. Thilman was a decree *in rem* which was final and conclusive against the plaintiffs since the plaintiffs had filed no claim against the estate of Francis L. Thilman and in no way challenged the proceedings in the Francis L. Thilman estate.

"(2)   In decreeing and declaring that the contract dated July 30, 1940 (Pl. Ex. 4), was a contract for the support and maintenance of Margaret Thilman during her natural life and that by reason of the death of Francis L. Thilman on or about July 15, 1945, the said Francis L. Thilman had failed to fully perform the contract in accordance with its terms, thereby causing a partial failure of consideration.

"(3)   In granting judgment in favor of the plaintiff Margaret Thilman against the remainderman's interest of the defendant Myrtle Thilman in the real estate in the sum of $5350.00 and interest.

"(4)   In refusing to decree that the plaintiffs had no claim whatsoever against the defendant Myrtle Thilman's property.

"(5)   In refusing to dismiss plaintiffs' case with prejudice and without costs.

"(6)   In refusing to grant defendant's motion for judgment notwithstanding the decision of the court or in the alternative for a new trial."

Cross-appellants state their assignments of error as follows:

"(1)   The Trial Court erred in finding Margaret Thilman mentally competent at the time she executed the following documents:  Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 10 and 18.

"(2) The Trial Court erred in not finding Margaret Thilman executed Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 10 and 18 by reason of undue influence, fear, threats and coercion exercised by Francis Thilman and Myrtle Thilman.

"(3) The Trial Court erred in not cancelling, annulling, rescinding and holding for naught Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 10 and 18 by reason of the mental incompetency of Margaret Thilman at the time of their execution, or that they were executed by reason of undue influence, fear, threats and coercion exercised by Francis and Myrtle Thilman.

"(4) The Trial Court erred in not holding that Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 10 and 18 should be rescinded by reason of the failure of consideration.

"In the alternative, if this Court should deny plaintiffs relief upon the foregoing assignments of error, then plaintiffs assign the following error:

"(5) The Trial Court erred in not awarding Margaret Thilman sufficient monetary damage for the loss sustained by reason of the breach of plaintiffs' Exhibit 4, caused by the death of Francis Thilman."

At the close of the case, the trial court delivered a lengthy and comprehensive oral summation of the testimony and, later, when ruling upon appellant's motion for judgment notwithstanding the decision of the court or, in the alternative, for a new trial, filed a written memorandum opinion. Both opinions are contained in the statement of facts.

Respondent Margaret Thilman testified on the trial as a witness on her own behalf, her testimony comprising over two hundred pages of the statement of facts.

Respondents and cross-appellants (whom we shall hereafter refer to as respondents) alleged in their complaint and contended on the trial that, during the year 1940, when the first group of instruments referred to herein was executed, and thereafter, Margaret Thilman was mentally incompetent to transact business. However, when the action was instituted, respondents did not ask for the appointment either of a general guardian or a guardian *ad litem* to represent Margaret Thilman. One of respondents' counsel testified concerning this matter, stating that while, at the time of the institution of the action, Mrs. Thilman's mental ca-

pacity was doubtful, as it was desired that she testify at the trial as a witness on her own behalf, respondents did not request the appointment of a guardian *ad litem*.

Toward the close of the trial, appellant's counsel suggested that, as respondents contended that Margaret Thilman was incompetent in 1940, and as appellant was seeking in this action to quiet her title to real estate against Margaret Thilman, appellant thought it desirable that a guardian *ad litem* for Margaret Thilman be appointed. After a discussion between the court and counsel for the respective parties, counsel for respondents acquiesced in the suggestion of counsel for appellant, and the court appointed William B. Holst, Esquire, one of respondents' attorneys, as guardian *ad litem* for Margaret Thilman.

A brief statement of certain facts appearing from the evidence, in which we consider not only pertinent portions of the evidence but the oral summation of the trial court, is appropriate.

In 1940, Margaret Thilman was seventy-one years of age, and, in 1937, she had experienced a serious illness, which was, however, apparently not of long duration. At the time of the trial, she was, of course, seventy-seven years of age, and suffered from the infirmities which usually accompany the progress of the years.

It is a reasonable deduction from the evidence that, as a general practice, the Thilman family had been inclined to live by themselves upon their farm. Neither of the daughters of Louis Thilman by his first wife was called as a witness on the trial (at which time they were about sixty-five and fifty-five years of age, respectively), and it appears that for years neither of them ever left the farm, save for necessary treatment when ill. Respondents, in their complaint, alleged their incompetency, and at the time of the institution of this action, obtained the appointment of a guardian *ad litem* for them. Each of these respondents is, of course, irrespective of the final result of this action, the owner of an undivided one-eighth interest in the fifty-two-acre farm, subject to Margaret Thilman's life estate.

The evidence clearly indicates that, of her two sons, Paul was Mrs. Thilman's favorite. Francis, however, had been the one who lived on and cared for the farm, although there is evidence to the effect that, until about the time of his marriage to appellant, he was a somewhat indifferent farmer. After about 1930, however, as his mother grew older, Francis undoubtedly conducted the farm in a very efficient manner.

It appears from the evidence that, at least after Paul's death, Margaret Thilman and Paul's widow were not on particularly good terms. There is evidence to the effect that Margaret Thilman had stated that Paul's widow had threatened to make trouble for Francis because, when his mother turned over to him eight thousand dollars, Francis had not included that amount, as received by him, in his statement for income tax purposes. It is perfectly credible that this sum was turned over to Francis as payment for services which he had rendered in caring for the farm. Whatever the reason, it certainly was not an excessive payment for the period during which he had worked on the farm. Whether this money was a gift or a token of affectionate appreciation of services rendered is unimportant.

It is easy to understand that, after Paul's death, his widow would wish that Margaret Thilman would provide for her granddaughter (Paul's daughter) by way of some testamentary bequest. It is also very easy to understand that, after the death of Francis, respondent Katherine Engberg would be all the more anxious that provision be made for her daughter.

As stated by the trial court in its oral summation, it appears from the testimony of practically all of the witnesses that Margaret Thilman was, during most of her adult life, a very shrewd and keen businesswoman, well able to take care of her affairs, and with discrimination to know exactly what she wanted. Even respondent Katherine Engberg gave testimony to that effect, although limiting the time to the period prior to 1937, testifying that, subsequent to that year, in her opinion, Mrs. Thilman was incompetent. We find little basis in the evidence for concluding that Mrs. Thil-

man's illness in 1937 affected her mentality. The trial court summed up the situation as follows:

"Even in her present state of mind, as the Court observed her on the stand, she was a woman of rather quick and shrewd mental capabilities, it seemed to me. The way she answered the questions without hesitation, the way that she responded to the questions of counsel on both sides, would certainly indicate to the Court that at least until such time as she became confused or partially confused that she was a very keen person mentally."

After Paul's death, Mrs. Thilman's blood relatives were her son, Francis, and her granddaughter, Margaret Mary. It would seem very natural that, having given Paul a tract of land, her son, Francis, would be the chief object of her bounty.

The trial court, in summing up the evidence bearing upon the mental capacity of Margaret Thilman in 1940, stated as its considered conclusion that she was mentally competent at that time. As we have often stated, upon such a question the opinion of the trial court carries great weight. The court had the advantage of hearing Mrs. Thilman testify, and also of hearing the other witnesses testify concerning this matter. Upon this phase of the case, the record amply supports the trial court's holding that, at the time Margaret Thilman executed the instruments which she signed in July, 1940, and at the times when she signed other instruments which are exhibits in the case and concern the subject matter thereof, she was entirely competent to understand the nature of the instruments which she signed, and was mentally competent to execute and deliver the same. It is unnecessary to extend this opinion further by reviewing that aspect of the evidence.

Some recent opinions of this court are of interest in connection with the phase of the case above discussed: *In re Miller's Estate,* 10 Wn. (2d) 258, 116 P. (2d) 526; *Page v. Prudential Life Ins. Co.,* 12 Wn. (2d) 101, 120 P. (2d) 527; *In re Denison's Estate,* 23 Wn. (2d) 699, 162 P. (2d) 245; *In re Whittier's Estate,* 26 Wn. (2d) 833, 176 P. (2d) 281. While, in these cases, the matter of testamentary capacity

was considered, the degree of mentality necessary to execute a will would, in a general way, correspond with that required to enable a person to make a valid deed or contract.

Respondents (as cross-appellants) contend that the instruments executed by Margaret Thilman were the result of undue influence exercised upon her by Francis and Myrtle Thilman. The record contains little or no evidence that either Francis or Myrtle influenced his mother to even the least extent in executing any of the instruments which respondents attack in this action. It would be only reasonable to suppose that, after the death of Paul, the matter of the present and future disposition of Margaret Thilman's property would be a subject of discussion between the mother and her son.

Respondents strongly rely upon their contention that, at this time, Margaret Thilman lacked mental capacity to make valid contracts, but, in their brief, they do not call attention to any portion of the record which supports their claim that Francis and Myrtle persuaded Margaret Thilman to execute the instruments in question by using undue (or even any) influence over her. Francis was then, of course, one of the chief objects of his mother's bounty.

Mrs. Thilman, with her son and daughter-in-law, consulted C. W. Halverson, Esquire, an attorney, who testified that Mrs. Thilman was mentally competent to contract and knew what she wanted to do. The trial court properly gave consideration to Mr. Halverson's testimony, and to that of Paul M. Goode, Esquire, who witnessed Mrs. Thilman's will. Both of these witnesses testified that Mrs. Thilman was mentally competent and understood the import of the instruments she executed.

The documents were not hurriedly prepared but were drawn after discussion and consideration. It does not appear that Mrs. Thilman, at any time prior to the death of Francis, raised any objection whatever to the situation created by the instruments of which she now complains.

Katherine Engberg, testifying as a witness for respondents, stated that, during the month of October, 1944, she re-

ceived an anonymous, typewritten communication reading as follows:

"Dear Mrs Thilman;                              Oct 26, 1944
   "You might be interested to know that recently there has been put on record a transfer of property from Mrs Margaret Thilman to Francis Thilman."

Doubtless, neighbors were interested in the possible clash of interests between Francis and Paul's minor daughter, in connection with the disposition of Margaret Thilman's property.

In any event, it does not appear that Margaret Thilman expressed any dissatisfaction with the arrangements which had been made until some time after the death of Francis.

In the recent case of *Parris v. Benedict,* 28 Wn. (2d) 817, 184 P. (2d) 63, we reversed a judgment of the superior court canceling two deeds executed and delivered by the mother of six children to one of her daughters. Four of the children were plaintiffs in the action, two of the daughters being named as defendants. From a judgment rendered in favor of the plaintiffs, one of the defendant daughters appealed.

At the time of the execution of the deeds, the grantor mother was eighty-three years of age, and plaintiffs alleged, in their complaint, that she was mentally incompetent to convey her property, and that the conveyances had been executed and delivered as the result of undue influence exerted upon her by the grantee. The court found that the mother, Mrs. Parris, was mentally competent to execute the deeds but that, at the time of their execution, she was subjected to undue influence exerted by the two daughters. The court further found that one of the defendants, Ruby Ray, had received no part of the property conveyed by the deeds, and granted the motion for nonsuit as to her and her husband, who had been named as a party defendant. The trial court then entered judgment for the plaintiffs as against the other defendant, Nena Benedict, and her husband, Alvin Benedict, setting aside the deeds to Mrs. Benedict.

The facts bear some resemblance to those in the case at bar, both as to the evidence concerning the mental compe-

tency of the mother, Mrs. Parris, and the execution of the two deeds to Nena Benedict. There is a fundamental difference between the facts in the case cited and those appearing in the case at bar, as, in the case cited, the grantor had several other living children; while, in the case at bar, Mrs. Thilman had no surviving child other than Francis, her only other blood relative being her granddaughter, Margaret Mary. It is also true that, in the case cited, the mother retained the greater portion of her property.

In the case cited, this court obtained "the distinct impression that Mrs. Parris was not susceptible to coercion by her children." We obtain a similar impression concerning Margaret Thilman, from the evidence before us. In the course of the opinion, we said:

"It is the essence of 'undue influence' that the victim thereof is rendered incapable of acting upon his own motives. *Parr v. Campbell,* 109 Wash. 376, 186 Pac. 858. This implies a weak mentality, and it is notable that in each of four cases in which this court has approved the cancellation of deeds for undue influence exerted upon the grantors, the court found the grantor to be mentally incompetent, or virtually so. *Kennedy v. Currie, supra* [3 Wash. 442, 28 Pac. 1028]; *Hattie v. Potter, supra* [54 Wash. 170, 102 Pac. 1023]; *Perry v. Wetzel, supra* [122 Wash. 129, 210 Pac. 362]; and *Christensen v. Nielson,* 184 Wash. 517, 51 P. (2d) 615, the facts of which are set forth in the opinion in the earlier case of *In re Hanson's Estate,* 169 Wash. 637, 14 P. (2d) 702. Conversely, in each of seven like cases, in which this court refused cancellation of the deeds, the grantor was found to be clear in mind, or at least not mentally incompetent. *Florin v. Florin,* 49 Wash. 37, 94 Pac. 658; *Balam v. Rouleau,* 52 Wash. 389, 100 Pac. 833; *Parr v. Campbell, supra; Thomas v. Maring,* 144 Wash. 657, 258 Pac. 465; *Fox v. Fox,* 164 Wash. 373, 2 P. (2d) 642; *McNall v. Smith,* 189 Wash. 662, 66 P. (2d) 316; *Kalkwarf v. Geschke,* 194 Wash. 135, 77 P. (2d) 612.

"We do not mean to imply that undue influence is impossible unless the grantor be mentally incompetent. It is simply less probable, if the grantor is clear and strong in mind, that he would 'do what is against his will, but what he is unable to refuse.' *O'Neall v. Farr,* 1 Rich. L. (S. C.) 80. In such a case, before the court asserts the power to cancel a questioned deed, it must require some positive evi-

dence, albeit circumstantial, that wrongful influence was exerted to procure the conveyance. As the cases cited abundantly demonstrate, it is one thing to 'vigilantly and carefully scrutinize' the circumstances attending a deed between parent and child, and quite another thing to assume undue influence."

A careful study of the evidence convinces us that the trial court did not err in holding that Margaret Thilman was not induced to execute the documents in question as the result of undue influence of any sort or description brought to bear upon her by her son Francis Thilman, or his wife, the appellant, Myrtle Thilman. The record contains not the slightest suggestion that either Francis Thilman or the appellant ever exercised, or attempted to exercise, any duress or coercion over Margaret Thilman. It is inconceivable that Mrs. Thilman was, as alleged in the complaint, induced by fear, or coercion, to enter into the contracts referred to above.

We now consider the nature and effect of the agreement, hereinabove set forth, dated July 30, 1940, between respondent Margaret Thilman and her son Francis Thilman. In this agreement, Mrs. Thilman stated that it was her desire that Francis "continue to farm and operate the home place for her so long as he is physically able during the remainder" of Mrs. Thilman's life. The agreement then recites the delivery of a deed from Mrs. Thilman to Francis, conveying all of her interest in the eighty acres of land, reserving to herself a life estate, and also refers to the bill of sale of the livestock and farm equipment, conveying that property to Francis, without reservation.

By the next paragraph, Francis agreed "that so long as he is physically able he will," during his mother's lifetime, farm and operate the land for an annual salary of six hundred dollars, together with certain specified privileges. This paragraph continues:

"It is expressly understood and agreed that should said Francis L. Thilman die or become physically unable to farm said property before the death of his mother that this agreement nevertheless in all respects shall remain in full force and effect and be enforceable by the parties hereto, their

heirs, administrators, executors or assigns, except said salary payment shall stop during the period of incapacity, if any, of [Francis Thilman]."

The language of the agreement, considered as a whole, and, particularly, the language last above quoted, is clear and unambiguous. The possibility of the death of Francis during his mother's lifetime was considered, and the possibility that he might become physically disabled is mentioned three times. The contract contains no alternative provisions to become effective in case of the death of Francis, or his physical incapacity to farm the property, prior to the decease of his mother. On the contrary, the agreement states that, notwithstanding such an event, the contract shall remain in full force and effect and be enforcible, save as to the payment of salary to Francis.

In the case of *John Soley & Sons v. Jones,* 208 Mass. 561, 95 N. E. 94, the plaintiff sued for a balance alleged to be due under a contract, whereby the plaintiff agreed to accomplish a portion of the construction work in which the defendant was engaged, under a contract with the city of Boston. The contract between defendant and the city contained a clause to the effect that an agency of the city had the right to terminate the contract under certain circumstances. The contract between the plaintiff and the defendant referred to defendant's contract with the city. The authorities of the city terminated the defendant's contract, and it was held that, the plaintiff and the defendant having entered into their contract with knowledge that defendant's contract with the city might be terminated, the defendant was bound by his agreement to pay to the plaintiff the stipulated contract price for the work which he agreed to do, and that the plaintiff was entitled to recover the unpaid balance due under the contract, less the reasonable cost of completing his work. The court reached this conclusion because the plaintiff and the defendant contracted with knowledge that the defendant's contract with the city might be terminated, but, in their contract, made no provision for the termination of the contract between the plaintiff

and the defendant in case the carrying out of defendant's contract with the city should be ended by the city's order.

In contracts for personal services, when deciding the rights of the parties in case performance of the contract becomes impossible because of death or physical disability, a crucial point is whether or not such an event was within the contemplation of the parties and provided for in the contract.

In the case of *White v. Sailors*, 17 Ga. App. 550, 87 S. E. 831, it appeared that, September 12, 1913, one White contracted with the defendant, Sailors, to the effect that the defendant would furnish him with board, washing, and sewing for one year from September 15, 1913, and that he would pay therefor by delivery of twenty-five hundred pounds of cotton. Payment was made soon after the execution of the contract, and Mr. White died November 22, 1913. His executor sued for the recovery of a proportionate part of the consideration paid for the year's service, contending that the contract was severable and should be apportioned. The court of appeals of Georgia held that the contract was not severable, and affirmed the judgment of the trial court in favor of the defendant.

In the course of the opinion, the court cited the case of *Epps v. Story*, 109 Ga. 302, 34 S. E. 662, in which a father sought to rescind a parol contract between himself and a daughter, whereby the daughter was to receive a tract of land in consideration for a measure of her father's future support. After the contract had been in force and carried out for a period of time, the father, having apparently become displeased with his daughter, refused to allow her to furnish him support, and sued to rescind the contract. The supreme court of Georgia affirmed a judgment in favor of the defendant. The facts of the case differ somewhat from those in the case at bar, but the court's opinion has some bearing upon the questions here presented.

In 6 Williston on Contracts (Rev. ed.) 5434, § 1940, appears the following text:

"One who engages for performance of such personal character that it can be performed only by a particular person

is excused from liability by the physical incapacity of that person, before breach of the contract, *unless he has clearly assumed the risk of such incapacity.* Cases illustrating this principle relate generally to contracts of employment; and the death or long-continued illness of the employee in effect discharges his promise." (Italics ours.)

In the case at bar, the parties were very careful to show, in clear language, that they had in mind the possibility that Francis might become ill or that he might die prior to the death of his mother. The contract is unambiguous, and, as we hold that it was, in all respects, a complete and valid contract between the parties; it follows that it must be given effect in accordance with its plain terms. Of course, that Francis might die prior to the death of his mother was a most improbable possibility, but, in any event, Margaret Thilman was careful to reserve her life estate in the fifty-two-acre farm.

Respondents cite the case of *Payette v. Ferrier*, 20 Wash. 479, 55 Pac. 629 (there was a later appeal in the same case, *Payette v. Ferrier*, 31 Wash. 43, 71 Pac. 546), in which it appeared that a father had deeded real estate, consisting of a farm, to his daughter and son-in-law in consideration of one dollar and covenants by the grantees to clothe, board, and maintain the grantor during his lifetime or, in the alternative, to pay in kind a certain rental. The deed was delivered and recorded, and, thereafter, the daughter and her husband died. The surviving father sued the administrator of their estates and the guardian of their minor children, praying for a cancellation of the deed or, in the alternative, for a lien on the premises for his support. It does not appear that the possibility of the deaths of the grantees prior to that of the grantor was considered by the parties. In the course of the opinion, this court said:

"It appears from the complaint in the present case that the sole consideration for the conveyance from the plaintiff to his daughter and her husband was their agreement to support and maintain him. The duty to do so was and became a personal and continuing one. The obligation was not assignable, but to be performed by them only. . . .

"We think there is also another reason why the plaintiff

is entitled to be revested with title. The covenants of the grantees to support and maintain the plaintiff were personal and died with them. The happening of that event put an end to the obligation. *Bishop v. Aldrich, supra* [48 Wis. 619, 4 N. W. 775]. Upon principle, the question does not differ from the one we have just discussed. The right of the parent to a return rests in either case upon the failure of consideration, and inability of his child to render the service or perform the condition upon which he was intrusted with the property."

It was held that the plaintiff was entitled to relief.

Respondents cite the recent case of *Hesselgrave v. Mott,* 23 Wn. (2d) 270, 160 P. (2d) 521, which was also an action instituted by the grantor in a deed made to the defendants, as a portion of an agreement between the parties to the deed, for the care of the grantor. The facts in the cases cited differ radically from those in the case at bar, and the cases are not here in point.

While ruling that Margaret Thilman was mentally competent to execute the instruments attacked by respondents in this action, and that, in executing the same, Margaret Thilman was not subjected to duress, coercion, or undue influence (in considering the matter of undue influence, the court referred to and relied upon the case of *Parr v. Campbell,* 109 Wash. 376, 186 Pac. 858, which clearly supports the court's conclusion), the trial court held that, by the above-quoted agreement between his mother and himself, Francis Thilman assumed the obligation to support and maintain his mother during her lifetime, and that, because Francis Thilman died during the lifetime of his mother, the consideration promised by him, in part, had failed.

The trial court did not cancel or set aside the contracts between the parties because of the supposed partial failure of consideration on the part of Francis, but decreed

" . . . that the contract made and entered into the 30th day of July, 1940, between Margaret Thilman and Francis L. Thilman, her son, . . . be and the same hereby is declared to be a contract for the support and maintenance of the said Margaret Thilman during her natural life; that by reason of the death of Francis L. Thilman on or about the 15th day of July, 1945, the said Francis

L. Thilman failed to fully perform the contract in accordance with its terms and thereby caused a partial failure of consideration; that said contract involved the personal services and skill of the said Francis L. Thilman and could not be performed by Myrtle L. Thilman or any other person."

The court then, after adjudging that, because of the partial performance by Francis, the contract should not be rescinded, decreed that the appellant, Myrtle Thilman, pay to Margaret Thilman the sum of $5,350 within six months, together with interest, and impressed a lien therefor upon appellant's one-half interest in the fifty-two-acre farm.

This portion of the decree was based upon the trial court's adjudication that the agreement dated July 30, 1940, was a contract on the part of Francis Thilman for the support and maintenance of his mother during her natural life. Being of the opinion that Francis had rendered the services provided for by the agreement for the period of five years, or until his death, and that Margaret Thilman had not received the full consideration contemplated by the agreement, namely, "support and maintenance" during her lifetime, the trial court decreed the payment to Margaret Thilman referred to above.

By the contract, it was agreed that, so long as Francis Thilman

". . . is physically able he will during the remainder of the life of his mother, Margaret Thilman, and during the period of her life estate, farm and operate the home place . . . for an annual salary of $600.00 per year . . . that he will during said period of time devote his work and best efforts to the farming of said home place. . . . It is expressly understood and agreed that should said Francis L. Thilman die or become physically unable to farm said property before the death of his mother that this agreement nevertheless in all respects shall remain in full force and effect and be enforceable by the parties hereto, their heirs, administrators, executors or assigns, except said salary payment shall stop during the period of incapacity, if any, of [Francis Thilman]."

By the instrument thereafter entered into between Margaret Thilman and her son Francis, namely, the agreement and lease of May 14, 1945, whereby Margaret Thilman, for

a reserved rental, leased to Francis the fifty-two-acre farm for the term ending October 31, 1945, giving him an option to renew the lease for another year, Francis was, at least temporarily, released from the duty to work on the farm on behalf of his mother, as provided in the agreement of July 30, 1940. His obligation then became to pay the stipulated rental to Margaret Thilman. The death of Francis Thilman occurred during the term of the lease, which renders unnecessary any consideration of the question as to whether he was released permanently or merely temporarily from the obligation to operate the farm for his mother. Margaret Thilman then, from and after October 31, 1945, had the right to manage or lease the farm, and she did lease it to a lessee evidently satisfactory to her.

While the death of Francis Thilman during his mother's lifetime was, as above stated, a remote possibility, that event was specifically provided for in the contract, and, by the subsequent agreement between the parties, Francis Thilman was, by Margaret Thilman, released from his obligation to manage the farm, and Margaret Thilman was released from her obligation to pay Francis for so doing.

The agreement of July 30, 1940, cannot be construed as a contract by Francis Thilman to operate the farm during his mother's lifetime, nor as an agreement on his part to support and maintain his mother until her decease. At no time did Margaret Thilman divest herself of property, or the income therefrom, in consideration of a promise by Francis to manage the farm during her lifetime, or to furnish her support and maintenance.

As above stated, the contract specifically provided that the promise of Francis to operate the farm was dependent upon his continued physical ability to do so, the possibility of his death being provided for in words too plain for any construction other than to give them their literal meaning.

The record discloses no ground for the granting of equitable relief to Mrs. Thilman because of the death of Francis. Mrs. Thilman, at all times, retained her life estate in the fifty-two-acre farm. It does not appear that the twenty-eight acres of dry lands had ever produced any

income worth considering. Mrs. Thilman was secured in her home and household furniture during her lifetime. Incidentally, it may be noted that, during the month of July, 1940, she was not penniless, but had an account in a Yakima bank amounting to something over fifty-five hundred dollars. The following month she received over twenty-five hundred dollars from the sale of her pear crop.

The highest valuation put upon the fifty-two-acre farm was placed by a witness who estimated its value at fifteen thousand five hundred dollars. This, of course, was the value of the fee simple title, of which Mrs. Thilman owned one half. Francis Thilman received, by the agreement with his mother and her deed, her one-half interest, subject to Mrs. Thilman's life estate. Of course, Francis, in addition, received a fee simple title to the twenty-eight acres of dry lands.

Considering the contracts between the parties, and the entire record in the case, we find no basis for the exercise of the equity powers of the court in granting Margaret Thilman the lien on the farm, referred to above.

The trial court erred in decreeing that, on the facts shown, the contracts between the parties amounted to an agreement by Francis Thilman to support and maintain Margaret Thilman during her natural life.

The trial court also erred in entering that portion of the decree whereby it was adjudged and decreed that appellant, Myrtle Thilman, should pay to respondent Margaret Thilman the sum of $5,350, within six months from the date of the entry of the decree, together with interest, and granting to respondent Margaret Thilman a lien upon certain real estate described in the decree in the amount of the award.

Appellant argues that respondents' action is barred, in its entirety, because neither Margaret Thilman nor any other respondent filed any claim against the estate of Francis Thilman. This estate was regularly probated, notice to creditors was published, and, in due time, a decree of distribution was entered, pursuant to the provisions of Mr. Thilman's will, distributing the estate to appellant, Myrtle Thilman.

Respondents' cause of action, as stated in their amended complaint, consisted of an attack upon the written instruments executed by Margaret and Francis Thilman, respondents contending that these contracts were, respectively, void; first, because of mental incapacity on the part of Margaret Thilman to enter into any contract, and, second, that, if she possessed mental capacity at the appropriate times, the contracts were induced by Francis and Myrtle Thilman by undue influence, duress, or coercion.

In view of our holding upon other phases of the case, it is unnecessary to discuss this question and decide whether or not the cause of action stated in respondents' amended complaint was based upon facts of such a nature that, as a prerequisite to maintaining respondents' action, a claim must seasonably have been presented to the executrix of Francis Thilman's estate. We, therefore, express no opinion upon this question.

There is, however, another phase of the matter, inherent in the decree appealed from, which should be noted. The trial court, while holding, contrary to respondents' contentions, that Margaret Thilman did possess mental capacity to contract, and that no undue influence, duress, or coercion, was exercised over her by Francis and Myrtle Thilman, construed the basic contract between the parties (that of July 30, 1940, between Margaret and Francis Thilman) as one whereby Francis Thilman agreed to support and maintain his mother during her lifetime. The trial court, then, based the amount awarded to Margaret Thilman upon a cause of action which arose *ex contractu*.

If the construction which the trial court placed upon the contract had been correct, which we hold it was not, the contract between Mrs. Thilman and Francis was, *ab initio*, one which included an obligation on the part of Francis to support and maintain his mother during her lifetime. An action by Mrs. Thilman for support, based upon the contract, would then be an action arising *ex contractu*, and entirely different in nature from that alleged in respondents' complaint. Whether or not such an action could be maintained, under the circumstances present in the case at bar,

without timely presentation of a claim by Margaret Thilman to the executrix of the estate of Francis Thilman, would present a different question from that hereinabove stated.

We merely call attention to this matter, also without expressing any opinion thereon.

The decree appealed from is reversed, and the cause remanded to the superior court, with instructions to enter a decree dismissing respondents' action with prejudice, and quieting the title of appellant, Myrtle Thilman, to the real estate described in the decree before us, subject to Margaret Thilman's life estate in the fifty-two-acre farm.

MALLERY, C. J., STEINERT, JEFFERS, and HILL, JJ., concur.